CHARLES J. ELLEDGE,             )
                                   )
       Plaintiff,             )
                                   )
       v.                     )
                                   )       <u>ORDER</u>
LOWE'S HOME CENTERS, LLC,    )
                                   )
       Defendant.        )
                                   )
_____)

**THIS MATTER** comes before the Court upon Defendant Lowe's Motion for Summary Judgment, (Doc. No. 36); Plaintiff's Response in Opposition, (Doc. No. 51); Defendant's Reply, (Doc. No. 56); and the parties supporting exhibits. Also before the Court is Plaintiff's Motion to Strike Supplemental Disclosures and Related Motions, (Doc. No. 40); Defendant's Response in Opposition, (Doc. No. 47); and Plaintiff's Reply, (Doc. No. 49). For the reasons set forth below, Defendant's Motion for Summary Judgment is **GRANTED**, and Plaintiff's Motion to Strike is **DISMISSED** as moot.

## I.    BACKGROUND

The record establishes, the parties agree, and/or the parties do not dispute the following.

### A.  Plaintiff's Employment History and Position at Lowe's

Plaintiff began working at Lowe's in 1993 and retired in 2015. (Doc. No. 52 ¶ 1). From 1994 to 2008, Plaintiff climbed the corporate ranks and was eventually

promoted to the position of Market Director of Stores (then called "district manager") in 2008. (Id. ¶¶ 2–6). Plaintiff was assigned to Market 1347, which had eight stores at the time. (Id. ¶ 8). This was the last position Plaintiff held at Lowe's before he retired in 2015. Market 1347 was comprised of twelve stores in Western North Carolina at the time Plaintiff retired. (Id. ¶ 9).

Market Directors ("MDs") are "ultimately responsible for overall store performance within their Markets with a primary focus on sales and profitability." (Doc. No. 39-14 at 2). This position requires MDs to frequently visit the stores in their market and, when visiting a store, "generally do a *walk-through* of the store to evaluate the merchandise, appearance, and talk with the staff." (Doc. No. 55 at 4). According to Plaintiff, Plaintiff regularly reviewed reports concerning each store's performance, traveled to the stores within his market, met with store managers and other personnel, and advised them on how to enhance the store sales and profits. (Doc. No. 53 ¶ 7). For each store, Plaintiff would spend approximately 1 hour in the office reviewing reports with the store manager and the remaining 2 or 3 hours on the floor. (Id. ¶ 35). Plaintiff usually visited two stores in one day and returned home later in the evening. (Id.). Plaintiff spent approximately 8 to 10 hours per day in the stores and 1 to 2 hours per day driving between stores, averaging 50 to 60 hours of work per week. (Id. ¶ 9).

**B. Onset of Plaintiff's Disability and Limitations at Work**

On December 29, 2014, Plaintiff had knee replacement surgery on his right knee. (Doc. No. 53 ¶ 14). This was his fourth knee surgery. (Id. ¶ 12). Prior to his

surgery, Plaintiff applied for a leave of absence with Defendant, which was approved in early December 2014. (Id. ¶ 13). Defendant was out of work from December 29, 2014 through April 12, 2015. (Doc. No. 52 ¶ 60). Plaintiff's FMLA leave expired on March 22, 2015, but, as an accommodation, Defendant provided Plaintiff a personal leave of absence for an additional two weeks through April 12, 2015. (Id. ¶ 63).

On March 24, 2015, Plaintiff reported to Dr. Anderson's office that he was concerned "over how much pain he still [had]" and "he [was] unsure if he [could] do his job" because "he drives an hour and a half to work then stands on the floor for 10-12hrs and drives back." (Doc. No. 52 ¶ 64). On April 1, 2015, Plaintiff saw Dr. Anderson for a follow-up visit and told Dr. Anderson that he felt "he [could] return to work 8-hour shifts with 50 percent standing only." (Id. ¶ 67). Dr. Anderson recommended that Plaintiff should be restricted to 8-hour days, including travel, and 4 hours of standing and walking. (Doc. No. 53 ¶ 20). Plaintiff usually worked more than this. (Doc. No. 52 ¶¶ 74–76). Dr. Anderson noted that the restrictions would be reevaluated in 6 months. (Id. ¶ 73).

Plaintiff submitted Dr. Anderson's restrictions to Defendant, and the Lowe's Accommodations Team approved the restrictions and memorialized the approved restrictions and accommodations by an Interactive Process Form sent to Plaintiff on April 16, 2015. (Doc. No. 53 ¶ 23). This form described the accommodations being offered to Plaintiff as follows:

> The following restrictions will be accommodated: Light duty to include, lifting no greater than 15 lbs, limit 8 hour work day, to include travel;

> standing/walking limited to 4 hr/per day. The use of a mobility device will be permitted in performing job duties. This accommodation is approved for a period of 60 days and will be reviewed at that time.

(Doc. No. 39-23). Plaintiff claims that he does not recall discussing or considering the use of a mobility device when he first returned to work and asserts that even though it was offered on the Interactive Process form, he did not believe he needed one and would not have expected to use one at that point given that his restrictions were approved. (Doc. No. 53 ¶ 25).

Plaintiff resumed his job duties from April 13 to June 30, 2015, and he estimates that, during this time, he adhered to Dr. Anderson's restrictions approximately 75% of the time, sometimes working longer hours and walking and standing in excess of his restrictions. (Doc. No. 53 ¶ 26). Plaintiff also would have the area team member traveling with him on the store visit drive the vehicle to and from stores so that he could rest his knee. (Id. ¶ 27). On June 1, 2015, the Accommodations Team again reviewed Plaintiff's accommodations and extended them for a period of six months to October 13, 2015. (Id. ¶ 28). The Interactive Process Form approving and extending his restrictions granted him the same restrictions as before and again specified that "Mr. Elledge will be permitted the use of a mobility device to assist in the performance of assigned duties." (Doc. No. 39-26). Plaintiff admits that he knew there were two motorized scooters in most stores and "vaguely remember[s]" a mention of mobility device on the June 1, 2015 form, but testified that he "didn't need one then and [he] would have never asked for one, and [he] just didn't need it." (Doc. No. 39-1 at 49–50).

4

On July 1, 2015, Plaintiff saw Dr. Anderson for his six-month check-up post-surgery. (Doc. No. 53 ¶ 30). Dr. Anderson noted that Plaintiff was improving, (Doc. No. 39-17 at 20–22), but also recommended that Plaintiff continue restrictions at work for another six months. (Doc. No. 39-17 at 20–22). Dr. Anderson certified Plaintiff's application for a handicap placard for his car. (Doc. No. 53 ¶ 32). Plaintiff forwarded Dr. Anderson's notes from the July 1, 2015 examination to (1) Hollie Reinhart, a Regional Human Resources Director in Plaintiff's region; (2) Julie Broombaugh, a member of the Accommodations Team; and (3) Laura Dover, the Regional Administrative Specialist for Plaintiff's region. (Doc. No. 52 ¶ 109; Doc. No. 39-29 at 2). In the email, Plaintiff noted that Dr. Anderson "was not very encouraged, as standing and walking is not helping with the pain or recovery. He also issued a permanent 'disabled parking' permit form." (Id.) The Accommodations Team approved his restrictions for an additional six months, through January 1, 2016. (Doc. No. 53 ¶ 33). Plaintiff signed an Interactive Process Form 7, which, this time, did not contain the prescription that Plaintiff could use a mobility device.[1] (Doc. No. 29–30 at 2).

On July 9, 2015, Broombaugh forwarded the signed Interactive Process Form to Reinhart who responded that she "would like to review this with [Broombaugh] before extending" because Reinhart "just learned of some information that may change this approval." (Doc. No. 39-31 at 2). According to Reinhart, Reinhart and

_____

[1] Defendant asserts this is because Plaintiff had already rejected the mobility device as an accommodation, and this was not pursued further. (Doc. No. 52 ¶ 114).

Delno Dryden, the Vice President of Store Operations for Plaintiff's region, were concerned that Plaintiff's medical restrictions were permanent due to Plaintiff's reference to a permanent handicap placard. (Doc. No. 52 ¶ 116). Subsequently, Broombaugh contacted Dr. Anderson's office to inquire if Plaintiff's restrictions were permanent and indicated that Plaintiff had said his restrictions were permanent.[2] (Doc. No. 53 ¶ 36). In response, Dr. Anderson responded that he recommended these be permanent restrictions. (Doc. No. 39-62 at 2).

On July 17, 2015, Dryden, Reinhart, and Elledge met to review Plaintiff's accommodation request so that they could "make sure [they] support[ed] [his] needs appropriately." (Doc. No. 39-33 at 2). Plaintiff testified that, during the meeting, Dryden and Reinhart were supportive and seemed concerned about Plaintiff's knee, did not question him about his willingness to work or his ability or performance, and instead asked what they could do to help him. (Doc. No. 53 ¶ 40). During the conversation, Plaintiff told Dryden and Reinhart that he had looked at corporate job postings to see if there was another position that would allow him to continue his career while also taking care of his knee. (Doc. No. 53 ¶ 40). Dryden and Reinhart told Plaintiff that they could help him investigate other positions if that was something he wanted to pursue. (Doc. No. 52 ¶ 138). Plaintiff, Dryden, and Reinhart discussed Plaintiff remaining in his MD role for six months and transitioning him to a different role after this time. (Id. ¶ 143).

---

[2] Plaintiff consistently denies that he ever told Lowe's employees that his restrictions were permanent. (Doc. No. 53 ¶ 36).

Plaintiff thought the meeting was the "start of a really good interactive dialogue between the three of [them]" and described the conversation as a "meaningful dialogue" between the parties. (Doc. No. 52 ¶ 135).

Dryden, Reinhart, and Plaintiff met again on August 3, 2015. (Doc. No. 52 ¶ 45). Dryden and Reinhart informed Plaintiff of the different options available to him and informed Plaintiff that he had thirty days to find another position. (Doc. No. 52 ¶ 153). On August 3, 2015, Reinhart sent Plaintiff an email, copying Dryden, that recapped the meeting: the email confirmed that

> (1) Plaintiff had a 30-day timeline for job reassignment,
> (2) it was Plaintiff's responsibility to look for positions of interest and tell Dryden and Reinhart about them so they could work with the accommodations team and the hiring managers;
> (3) Dryden and Reinhart would network internally to locate additional opportunities; and
> (4) if Plaintiff needed more time to search for jobs, Lowe's could place him on a leave of absence to give him more time to search.

(Doc. No. 39-36 at 2). On August 12, 2015, Plaintiff announced to his market team that he was being removed from his position (Doc. No. 53 ¶ 55). Plaintiff remained in his position and trained his replacement until approximately September 12, 2015. (Id.).

## C. Lowe's Hiring Policies and Plaintiff's Job Reassignment Process

### 1. Lowe's General Job Posting and Hiring Policies

Lowe's Customer Support Center Employment Procedure states that, as a general rule, all corporate jobs must be posted internally and externally for a minimum of five calendar days and interested candidates must submit an application online. (Doc. No. 39-16 at 2). There are five exceptions to this posting policy which

do not require the job to be posted. (Id. at 9). Among the exceptions are lateral transfers (e.g., reassignments of an employee to the same job in another department). (Id.). Lowe's policy is that after a Lowe's employee applies for a posted position, members of talent management screen the applicants and pass on the qualified candidates to the HR representative, who then present the candidates to the hiring manager. (Id. at 4–5). Lowe's also has an Enterprise Succession Management Process in place in which certain individuals who demonstrate leadership talent are identified as ready-now successors and placed in "Talent Pools." (Id. at 9–10). Leaders in the process are reviewed against open positions as Director or VP openings arise and recommendations are made to include them in the candidate pool. (Id. at 10).

2. Plaintiff's Job Identification and Application Process

After the August 3, 2015 meeting, Dryden and Reinhart began providing Plaintiff information about potential new positions, and Plaintiff admits that they "talked a lot about jobs" and "about different postings that [he] would be interested in." (Doc. No. 52 ¶ 178). Ultimately, Plaintiff identified and applied for three internal positions prior to October 2015: (1) Vice President, Contact Centers; (2) Director of Optimization; and (3) Merchandising Director, Lawn and Garden. In his Response to Defendant's Motion for Summary Judgment, Plaintiff does not contest that he was not qualified for the positions of Vice President, Contact Centers, and for the Director of Optimization. Therefore, the facts regarding Plaintiff's application process to those positions are not pertinent to this decision.

On September 14, 2015, Plaintiff applied for the position of Merchandising Director for Lawn and Garden in Mooresville, N.C. (Id. ¶ 237). The hiring manager for that position was Daryl Tilley. (Id. ¶ 238). Reinhart contacted Tilley in September 2015 about the open Merchandising Director position in the live goods area. (Id. ¶¶ 240–41). According to Reinhart, Tilley told Reinhart that he "would have concerns with [Plaintiff's] lack of experience around the line review process that this position would have responsibility for." (Id. ¶ 242). Tilley further explained that he was looking for a unique skillset to fill the role because live goods was a more specialized category, and the specific needs Tilley sought related to the live goods category. (Id. ¶¶ 253–55). Because the category is so challenging, Tilley testified that he put more time into succession planning and thought that it was easier to come in as a merchandising manager, learn the live-goods category, and work into a Merchandising Director role. (Id. ¶¶ 256–57). Tilley testified that he told Reinhart that he had a list of candidates in mind for the position, all of whom had experience as live goods merchandising managers. (Id. ¶¶ 258–59). Ryan Lane, one of the candidates from Tilley's list, was ultimately selected for the position—Lane had four years of experience as a merchandising manager in Ohio and had also previously served as a store manager, a regional sales and event manager, and a regional seasonal coordinator. (Id. ¶¶ 260–62). Plaintiff asserts that he was qualified for the position and actually had all of the "Preferred Qualifications." (Id. ¶ 263).

Despite Reinhart emailing Plaintiff about taking a manager role in the merchandising department, Plaintiff did not apply for the position. (Id. ¶¶ 269, 271).

Plaintiff avers that he did not apply because it was a demotion from a director-level to a manager-level position, it would have resulted in a substantial decrease in base pay, and he would not have been eligible for stock grants. (Id. ¶ 271). Similarly, Reinhart emailed Plaintiff about another manager-level position: manager of services. (Id. ¶ 274). Plaintiff asserts that he considered the position, but after engaging in several conversations with Lowe's employees, declined to apply for the same reasons he did not apply for a manager role in the merchandising department. (Id. ¶¶ 274–79).

3. Plaintiff's Departure from Lowe's

Lowe's eventually selected Jerry Hair to be the new MD for Market 1347. (Doc. No. 52 ¶ 280). Dryden extended Plaintiff's original 30-day deadline by 15 days from September 1, 2015 to September 16, 2015 so that Plaintiff would receive his stock grants. (Id. ¶ 281). In September 2015, Plaintiff took a leave of absence from Lowe's. (Id. ¶ 282). Plaintiff applied for and received disability benefits in September 2015. (Id. ¶ 284). In September 2015, Dr. Anderson completed an assessment of disability for Plaintiff. (Id. ¶¶ 283, 285). The form noted that Plaintiff could return to work with restrictions or an accommodation on September 1, 2016, Plaintiff was unable to walk or stand for more than 30 minutes, and Plaintiff could not walk through stores. (Doc. No. 39-52 at 2, 4). Dr. Anderson also replied "no" to the question on the form asking whether there was another accommodation instead of leave of absence that would enable Plaintiff to perform the essential job functions. (Id. at 5).

On January 6, 2016, Dr. Anderson examined Plaintiff and completed a disability assessment, in which he stated that Plaintiff could either stand or walk occasionally, meaning for not more than 2.5 hours per day. (Doc. No. 52 ¶ 295). Dr. Anderson's notes from the visit state that Plaintiff felt like he was "unable to return to his prior level of work." (Id. ¶ 296). Dr. Anderson testified that the hours were not a functional limitation, but one designed to prevent fatigue, which would be less of a problem as Plaintiff healed. (Doc. No. 53 ¶ 76).

Plaintiff received disability benefits from September 2015 through January 2016. (Doc. No. 52 ¶ 298). Plaintiff was unable to work without an accommodation in January 2016. (Id. ¶ 299). On January 31, 2016, Plaintiff's long-term disability was cancelled. (Doc. No. 53 ¶ 78). Plaintiff asserts that from September 2015 onward, he searched extensively for other jobs but had difficulty finding comparable employment, which Plaintiff attributes to his age and disability. (Id. ¶ 79). On November 16, 2015, Plaintiff filed a charge of discrimination with Equal Employment Opportunity Commission ("EEOC"). (Id. ¶ 300). In March 2016, Plaintiff applied for the Merchandising Director of Outdoor Power Equipment position. (Id. ¶ 301). Plaintiff was not interviewed for the position. (Id. ¶ 302). As with the Live Goods position, this position required conducting the product line review for Outdoor Power Equipment and negotiating with relevant vendors. (Id. ¶ 303). Lowe's hired someone for the position who came from a Leadership Development position where he had launched an Assistant Store Manager Leadership Development Program and led the Leadership Development Sessions for the National Sales Meetings. (Doc. No. 39-59).

On June 4, 2016, still without any ongoing income, Plaintiff requested early retirement from Lowe's, (Doc. No. 53 ¶ 81), and on June 11, 2016, Plaintiff officially retired from Lowe's. (Doc. No. 52 ¶ 305). Plaintiff contends that subsequently, his knee continued to improve and notes that in January 2017, Dr. Anderson released him from further examination. (Doc. No. 53 ¶ 82). Plaintiff claims that though he still experiences pain, it would not have prevented him from performing his former role as an MD. (Id.). In March 2017, Plaintiff obtained employment as a part-time paramedic at Wilkes County Emergency Medical Services, which is where he is currently employed (Id. ¶ 83). Plaintiff notes that he has been able to fulfill the physical requirements of the job. (Id.).

### D.  The Instant Suit

On December 27, 2016, Plaintiff filed suit against Lowe's Home Centers, LLC and Lowe's Companies, Inc. (Doc. No. 1). In his Complaint, Plaintiff alleges three causes of action: (1) disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.; (2) age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–34; and (3) retaliation in violation of the ADA and the ADEA. On February 22, 2017, Defendants filed an Answer. (Doc. No. 7). On January 8, 2018, Lowe's Companies, Inc. was dismissed as a Defendant to this suit pursuant to the parties' Joint Stipulation filed January 5, 2018, (Doc. No. 29). On April 10, 2018, Defendant Lowe's Home Centers, LLC (i.e., the sole remaining Defendant) moved for summary judgment (Doc. Nos. 36, 37). Plaintiff timely filed opposition briefing to Defendant's motion, (Doc. No. 51),

and Defendant timely filed a reply brief, (Doc. No. 56).  Defendant and Plaintiff submitted independent Statements of Material Facts, (Doc. Nos. 39, 53), and the parties submitted responses to the respective statements, (Doc. Nos. 52, 57).  On November 15, 2018, the Court held oral arguments on the pending motions.  Having been fully briefed and argued, these motions are now ripe for adjudication.

## II.    STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is material only if it might affect the outcome of the suit under governing law.  Id.  The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  This "burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  Id. at 325.

Once this initial burden is met, the burden shifts to the nonmoving party, which "must set forth specific facts showing that there is a genuine issue for trial."

Anderson, 477 U.S. at 250.  The nonmoving party may not rely upon mere allegations or denials of allegations in the pleadings to defeat a motion for summary judgment, rather it must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party."  Id. at 248; accord Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party.  Anderson, 477 U.S. at 255.  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).  The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion.  Anderson, 477 U.S. at 248–49.  "If the evidence is merely colorable or is not significantly probative," summary judgment is appropriate.  Id. at 249–50 (citations omitted).

## III.    DISCUSSION

Plaintiff alleges three causes of action against Defendant.  Each claim will be addressed in turn.

### A.    Failure to Accommodate Claim under the ADA

To survive a summary judgment motion on Plaintiff's failure to accommodate claim under the ADA, Plaintiff must show "(1) that [he] was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of

[his] disability; (3) that with reasonable accommodation [he] could perform the essential functions of the position; and (4) that the employer refused to make such accommodations." Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 579 (4th Cir. 2015) (quoting Wilson v. Dollar Gen. Corp., 717 F.3d 337, 345 (4th Cir. 2013) (brackets and ellipsis omitted)). This case, like Wilson, also "turns on whether Plaintiff satisfies the third element: that he was a qualified individual under the ADA, such that had he been given a reasonable accommodation, he could have "perform[ed] the essential functions of the job." Wilson, 717 F.3d at 345 (quoting 42 U.S.C. § 12111(8)).

### 1. Essential Functions of the MD Position

An ADA plaintiff bears the initial burden of proving that he is a "'qualified individual with a disability'—that is, a person 'who, with or without reasonable accommodation, can perform the essential functions'" of his job, Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806 (1999) (quoting 42 U.S.C. § 12111(8)). The Plaintiff must also initially identify a reasonable accommodation that would have allowed him to perform his job, Shin v. Univ. of Maryland Med. Sys. Corp., 369 F. App'x 472, 481 (4th Cir. 2010). Essential functions of the job bear more than a marginal relationship to the job at issue. Rohan v. Network Presentations, 375 F.3d 266, 279 (4th Cir. 2009). "[I]f an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). "Other relevant evidence can include 'the employer's judgment as to which functions

are essential,' 'the amount of time spent on the job performing the function,' 'the consequences of not requiring the incumbent to perform the function,' and the work experience of people who hold the same or similar job" <u>Jacobs v. N.C. Admin. Office of the Courts</u>, 780 F.3d 562, 579 (4th Cir. 2015) (quoting 29 C.F.R. § 1630.2(n)(3)). This Court has noted that "[a]n employer's judgment regarding the essential functions of its job is considered 'highly probative.'" <u>Rudolph v. Buncombe Cty. Gov't</u>, 846 F. Supp. 2d 461, 474 (W.D.N.C. 2012) (quoting <u>Alexander v. Northland Inn</u>, 321 F.3d 723, 727 (8th Cir. 2003)).

The record reflects that the parties agree that store visits and the attendant walking, standing, and travelling are essential functions of the MD position. Nevertheless, the Court still begins its inquiry by examining the Lowe's description of the MD position. Lowe's summarizes the MD position as follows:

> Market Directors of Stores are ultimately responsible for overall store performance within their Markets with a primary focus on sales and profitability. MDSs are expected to drive store sale growth and profitability by approaching their business strategically, studying issues and opportunities within their local markets, and working to develop/implement long-range plans that drive business objectives. MDSs must coach and develop the leadership talent in their Market and constantly prepare and lead their people through change. They need to empower Store Managers to lead their businesses and manage operations autonomously within their stores. MDSs are expected to have all stores in a state of sales and service readiness at all time and make sure that all corporate-originated programs are optimally implemented.

(Doc. No. 39-14 at 2). The MD job description enumerates the essential functions and responsibilities as informing and executing strategy, driving business results and maximizing sales, creating an obsession for service that differentiates Lowe's from

the competition, validates operational basics, builds talent pools, and supports employee engagement. (Id. at 2–3). Under the "Supports Employee Engagement" heading, the form states that an MD "(1) [p]romotes open and positive two-way communication with Store Management teams and employees during store visits, to ensure high employee engagement and morale" and (2) "[p]rovides support to ensure that all company training programs are being implemented consistently throughout the Market." (Id. at 3). The form states that the "employee must be able to perform the job responsibilities listed above with or without a reasonable accommodation." (Id.). The MD job description includes a listing of ADA Specifications that describe the physical requirements of the position. (Id. at 7). Standing, walking, and sitting are required "frequently," which is defined as 35 to 66 percent of the time. (Id.). Automobile travel was also continuously required to complete store visits, "continuously" being defined as 67 to 100 percent of the time. (Id.).

Thus, visiting stores, walking around stores, and travelling to and from stores seem to have comprised the lion share of Plaintiff's tasks as MD, and Plaintiff himself emphasized the importance of store visits. As an MD, Plaintiff was responsible for "developing store managers, assistant store managers, and department managers." (Doc. No. 52 ¶ 23). Plaintiff described store visits as "the cornerstone" to coaching store managers. (Doc. 39-1 at 27). And the parties generally agree that, at least in the manner in which Plaintiff previously performed the job, visiting two stores per day and travel took more than eight hours per day. Thus, Plaintiff's account and understanding of his position as MD corroborate the Lowe's description of the MD

position as well as the testimony of Dryden and Reinhart describing the job. Accordingly, the Court finds that store visits—along with the attendant walking, standing, and travel—and communicating with employees are "part and parcel of the [MD] position." Moore v. Wal-Mart Stores East, LP, Case No. 1:16-cv-362, 2018 WL 401544, at *5 (W.D.N.C. 2012) (finding that certain tasks were essential functions of the job because "the employer judges them to be so, a job description includes them, and multiple employees agree that they are part and parcel of the position").

   2.  Plaintiff's Inability to Perform the Essential Functions with His
       Restrictions.

   To succeed on his claim, Plaintiff must demonstrate that "he [could have] perform[ed] the essential functions of the job at the time of the employment decision or in the immediate future." Lamb v. Qualex, Inc., 33 Fed. App'x 49, 57 (4th Cir. 2002). Therefore, Plaintiff must show that he could have successfully performed the store visits along with the attendant standing, walking, and travel in September 2015 while adhering to his doctor's restrictions. Employers are not required under the ADA to allow "an employee to perform a job function that the employee's physician has forbidden." Scruggs v. Pulaski Cty., 817 F.3d 1087, 1094 (8th Cir. 2016). Additionally, Plaintiff must demonstrate that he himself was able to perform the essential functions of the job rather than delegating job responsibilities to another employee. White v. Buckeye Fire Equip. Co., No. 3:17-CV-404-MOC-DSC, 2018 WL 2304048, at *5 (W.D.N.C. 2018) ("A reasonable accommodation does not include forcing other employees to take on responsibility for essential functions.").

   Plaintiff has failed to demonstrate that he was performing the essential

18

functions of the MD position while adhering to Dr. Anderson's restrictions when he took a leave of absence in September 2015, nor has Plaintiff shown that he would have been able to perform those functions in the immediate future. First, Plaintiff admits that he was only adhering to his medical restrictions about 75% of the time and was overdosing with Ibuprofen. (Doc. No. 52 ¶¶ 82, 85-88). As such, Lowe's was not required to permit Plaintiff to continue performing essential job functions that Dr. Anderson prohibited Plaintiff from doing. Second, Plaintiff, Dryden, Reinhart, Broombaugh, Dover, and Bill Edwards (the Senior Vice President of Store Operations) all testified that MDs had to be able to walk or stand for more than four hours and work more than eight hours a day, including travel—something that Plaintiff could not do with his restrictions. (Doc. No. 38 ¶¶ 17, 20, 21, 28, 77, 90). As the Lowe's description of the MD position elucidates, MDs need to be able to stand, walk, and sit "frequently," (35–66% of the time) and travel by automobile "continuously" (67–100% of the time) to complete store visits. (Id. ¶ 21). During this time, Plaintiff had another area team member drive to and from visits so that he could rest his knee. Plaintiff intimates that since another area member would already be traveling with him, this did not impose an additional burden on Defendant. Nevertheless, under the law, reallocating the driving function to another employee does not constitute a reasonable accommodation. Moore v. Wal-Mart Stores E., LP., No. 1:16-CV-362, 2018 WL 401544, at *5 (W.D.N.C. Jan. 12, 2018) ("It is well-established that accommodations reallocating essential functions or requiring other employees to carry them out are not reasonable accommodations."). Thus, the

undisputed evidence demonstrates that Plaintiff could not perform the essential functions of the MD position at the time he took his leave of absence.[3]

3. Plaintiff Has Not Identified a Reasonable Accommodation.

Summary judgment is appropriate if: (1) Plaintiff fails to identify a reasonable accommodation, Shin, 369 F. App'x at 481, or (2) if Defendant can establish, as a matter of law, that the proposed modification will cause undue hardship in the particular circumstances, Halpern v. Wake Forest Univ. Health Servs., 669 F.3d 454, 464 (4th Cir. 2012). "A reasonable accommodation is one that is feasible or plausible." Reyazuddin v. Montgomery Cty., Maryland, 789 F.3d 407, 415 (4th Cir. 2015). Under the ADA, reasonable accommodations may comprise "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices," 42 U.S.C. § 12111(9)(B) and "permitting the use of accrued paid leave or providing additional unpaid leave for necessary treatment . . . ." 29 C.F.R. § 1630.2(o) (Appendix) (2011). To survive a

---

[3] Plaintiff asserts that his ability to successfully perform his job during the time of his disability is evidenced by the successful metrics Market 1347 enjoyed during this time. (See Doc. No. 54-5 reflecting the success and growth of Market 1347). But the success of Market 1347 is immaterial to whether Plaintiff was able to perform the essential functions of his job. See, e.g. Moore, 2018 WL 401544, at * 4 (rejecting plaintiff's argument that he could perform essential functions of the job because "upon returning to his job after sufficiently recovering from his stroke, he performed his job for fifteen months before his supervisors expressed any kind of displeasure with his performance"); Denman v. Davey Tree Expert Co., 266 F. App'x 377, 380 (6th Cir. 2007) ("Job performance is separate from the ability to show up for work, an essential function of his position."); Knutson v. Schwan's Home Serv., Inc., 711 F.3d 911, 915 (8th Cir. 2013) (rejecting argument by plaintiff that he managed his depot successfully without performing an essential function of the job because plaintiff's "specific personal experience is of no consequence in the essential functions equation").

motion for summary judgment, Plaintiff must "present evidence from which a jury may infer that the [proposed] accommodation is 'reasonable on its face, i.e., ordinarily or in the run of cases.'" <u>Reyazuddin</u>, 789 F.3d at 414 (quoting <u>Halpern</u>, 669 F.3d at 464, in turn quoting <u>U.S. Airways v. Barnett</u>, 535 U.S. 391, 401 (2002)). Plaintiff proposed two accommodations: (1) a permanent light duty position or (2) reassignment to another director position. Neither of these accommodations is reasonable.

    a. Permanent Light Duty Position

First, the permanent light duty position would be untenable in the MD position. The ADA does not require an employer to assign an employee permanent light duty. <u>Crabill v. Charlotte Mecklenburg Bd. Of Educ.</u>, 423 Fed. App'x 314, 323 (4th Cir. 2011). This is because often, lightening the load of one employee adds to the load of another. Additionally, an employee cannot point to an employer's willingness to temporarily lighten his job duties as necessarily meaning that the employer could indefinitely permit such a fundamental alteration of essential job functions. <u>See</u> <u>Moore</u>, 2018 WL 401544, at *5 (holding that the employer was not required to maintain a diminished level of exertion indefinitely because "the duty to provide an accommodation does not include creating a permanent light-duty position that does not otherwise exist.").

Here, Lowes made multiple, but temporary, reasonable accommodations for Plaintiff, assuming that Plaintiff's disability would improve after the relevant six-month periods. The June 1, 2015 Lowes Interactive Process Form that Defendant

received detailed the following:

> As an ADA Accommodation, Mr. Elledge will be accommodated with light duty, to include no lifting more than 15lbs, limited 8 hr work day including travel, limited standing/walking to 4 hrs per day to assist with managing his own chronic/serious medical condition. Mr. Elledge will be permitted the use of a mobility device to assist in the performance of assigned duties.

(Doc. No. 39-26 at 2). This particular form stated that the accommodation was temporary and was permitted from June 14, 2015 to October 13, 2015. (Id.). This was the second time Defendant received this ADA accommodation. While Lowes extended the accommodation, it was not required to indefinitely extend the accommodations it had made to Defendant.

Relatedly, Plaintiff contends that Defendant erred by prematurely concluding that his limitations were permanent in the first place. Plaintiff avers that he never told anyone his restrictions were permanent—rather, Plaintiff alleges that Defendant improperly inferred this from the fact that Dr. Anderson issued him a permanent handicap placard. Defendant counters Plaintiff's assertion with evidence from several of its employees claiming that Plaintiff told him his restrictions were permanent (or likely permanent). Plaintiff maintains that this contradicting testimony generates a fact issue which should preclude summary judgment; however, it is not material. The uncontradicted evidence shows that Reinhart and Dryden still reasonably believed that Plaintiff's restrictions were permanent as of July 2015. (Doc. No. 52 ¶ 116). Dr. Anderson, Plaintiff's treating physician, recommended that the restrictions be treated as permanent and his office relayed that recommendation to Defendant. (Id. ¶¶ 122–24). As the Fourth Circuit has held in an employment

case, it is the "perception of the decisionmaker that is relevant," and "whether the employer believed its stated reason to be credible." Holland v. Washington Homes, Inc., 487 F.3d 208, 217 (4th Cir. 2007). "Hindsight must not underestimate hard choices that employers, in consultation with their employees and medical professionals, confront at the time." Adams v. Anne Arundel Cty. Pub. Sch., 789 F.3d 422, 433 (4th Cir. 2015).

b.  Reassignment to Another Director-Level Position

Sometimes, reassignment to another position is considered a reasonable accommodation under the ADA. 42 U.S.C. § 12111(9)(B). That is not the case here. When a company operates a legitimate nondiscriminatory policy, like Lowe's policy, the employer "must be able to treat a disabled employee as it would any other worker" in the hiring process. E.E.O.C. v. Sara Lee Corp., 237 F.3d 349, 355 (4th Cir. 2001). The ADA's reasonable accommodation standard "does not require [Lowe's] to abandon [its] legitimate and non-discriminatory policy," id. at 353–54, nor does it entitle an employee to get whatever position he desires, Williams v. Brunswick Cty. Bd. Of Educ., 725 F. Supp. 2d 538, 549 (E.D.N.C. 2010). To merit reassignment, the disabled employee must be qualified for the position. Riley v. Weyerhaeuser Paper Co., 898 F. Supp. 324, 327 (W.D.N.C. 1995).

Lowe's has a longstanding job posting and standard hiring policy that requires all corporate jobs, except for lateral transfers, to be posted internally and externally for a minimum of five calendar days and requires interested candidates to submit an application online. (Doc. No. 39-16 at 2–3). Plaintiff asserts that, despite Reinhart's

alleged promise to help Plaintiff transition into a new position without the normal posting and application process, he had to find and apply for each job during that period. (Doc. No. 53 ¶ 57).

Plaintiff was not entitled to special treatment in violation of Lowe's longstanding non-discrimination job application and hiring policy. In 2002, the Supreme Court held that reassignment in violation of an employer's seniority system is normally an unreasonable accommodation. U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 402–03 (2002). However, the Circuits have split on whether an employer must reassign a disabled employee to a vacant position if that hiring violates or contradicts a neutral, nondiscriminatory hiring policy, such as the one at issue here.[4] The Fourth Circuit has not squarely addressed the issue, but in dicta, it has indicated that it probably sides with the Circuits that have held that the ADA is not an affirmative

---

[4] Compare E.E.O.C. v. St. Joseph's Hosp., Inc., 842 F.3d 1333, 1347 (11th Cir. 2016) ("[T]he ADA only requires an employer to allow a disabled person to compete equally with the rest of the world for a vacant position."); Huber v. Wal-Mart Stores, Inc., 486 F.3d 480, 483 (8th Cir. 2007) ("[T]he ADA is not an affirmative action statute and does not require an employer to reassign a qualified disabled employee to a vacant position when such a reassignment would violate a legitimate nondiscriminatory policy of the employer to hire the most qualified candidate."); Daugherty v. City of El Paso, 56 F.3d 695 (5th Cir. 1995) (same), with Smith v. Midland Brake, Inc., 180 F.3d 1154, 1165 (10th Cir. 1999) (stating that "the reassignment obligation must mean something more than merely allowing a disabled person to compete equally with the rest of the world for a vacant position"); Aka v. Was. Hosp. Ctr., 156 F.3d 1284 (D.C. Cir. 1998); see also Jackson v. Fujifilm Manufacturing USA, Inc., C.A. No. 8:09-cv-01328-JMC, 2011 WL 494281, at *2 (D.S.C. Feb. 7, 2011) ("[M]ost of the circuits which have examined the issue have found that the ADA is not an affirmative action statute and does not require [an employer to give a disabled employee preference]."); E.E.O.C. v. McLeod Health, Inc., 271 F. Supp. 3d 813 (D.S.C. 2017) (detailing the circuit split and the magistrate judge's decision to adopt the reasoning of the Eleventh, Eighth, and Fifth Circuits).

action statute and only requires that disabled persons be allowed to compete equally with nondisabled persons. For example, the Fourth Circuit in <u>E.E.O.C. v. Sara Lee Corporation</u>, held that, in the context of an employer's seniority system, the "ADA does not require employers to disrupt the operation of a defensible and non-discriminatory company policy in order to provide a reasonable accommodation;" "[r]ather, an employer must be able to treat a disabled employee as it would any other worker when the company operates a legitimate, nondiscriminatory policy." 237 F.3d 349, 354–55 (4th Cir. 2001). And in <u>Schneider v. Giant of Maryland</u>, the Fourth Circuit noted that "[a]n employer is not required to violate another employee's rights in favor of an employee with a disability in order to give the disabled employee a reasonable accommodation." 389 F. App'x 263, 271 (4th Cir. 2010). Accordingly, Plaintiff should not have enjoyed a privileged status in the job application process that would contravene Lowe's nondiscriminatory hiring policy in place. He was required to adhere to Lowe's standard policy and compete on equal footing with other employees and outside applicants.

Plaintiff applied for four director-level positions at Lowe's. The evidence reflects that Plaintiff did not obtain these positions because other applicants were more qualified. Apparently, Plaintiff concedes that he was not qualified for two of these positions—Vice President, Contact Centers and Director of Optimization—as he does not address his unsuccessful application to these positions in his Response to Defendant's Summary Judgment Motion. Nevertheless, Plaintiff avers that he identified and applied for two vacant positions for which he was well-qualified:

Merchandising Director in Lawn and Garden and Merchandising Director in Outdoor Power Equipment. Plaintiff asserts that Lowe's refusal to interview him for these positions, which he frames as "lateral reassignments," "raises issues as to whether it carried out its good faith obligations to engage in the interactive process and the 'reasonableness' of its rejection of his applications. (Doc. No. 55 at 20).

On the contrary, the record demonstrates that Plaintiff simply was not the best man—or even an appropriate man—for the job in both instances. In regard to the Merchandising Director in Lawn and Garden position, Plaintiff admits that the hiring manager, Tilley, wanted someone with product line review experience, something that Plaintiff did not have. (Doc. No. 52 ¶ 263). Additionally, Tilley testified that he did not believe Plaintiff was qualified for the Merchandising Director position because Plaintiff did not have live goods and/or seasonal experience, and Plaintiff would have had a steep and challenging learning curve to handle product line reviews at the director level without having prior experience. (Id. ¶ 264). Defendant notes that it did not even hire an external applicant who was currently serving as a Chief Executive Officer of another company for this position because the category is so challenging. (Id. ¶¶ 265–67). Instead, Defendant prefers to hire someone who already has a baseline knowledge of the category. (Id.) In this vein, Defendant was encouraged to apply for a manager position in the category with the hopes of later ascending the ranks. (Id. ¶¶ 257, 268). But Defendant did not apply for a manager position because it would have been a demotion and would have had undesirable financial consequences. Similarly, Plaintiff argues that he should have

been entitled to the position of Merchandising Director in Outdoor Power Equipment over the applicant who was eventually selected because "[o]n the face of their resumes, [P]laintiff had superior qualifications." (Doc. No. 55 at 17). Yet Plaintiff offers no evidence to support this contention, and the Court finds this bare assertion insufficient to survive summary judgment.

4. <u>Plaintiff Rejected A Reasonable Accommodation Defendant Offered Him.</u>

"If an employee rejects a reasonable accommodation, the individual is no longer considered a 'qualified individual with a disability.'" <u>Talley v. Family Dollar Stores of Ohio</u>, 542 F.3d 1099, 1108; <u>see also</u> <u>Andrew v. Com. Of Va.</u>, 2000 WL 1532333, at *1 (4th Cir. 2000) (finding that the accommodations offered to the plaintiff were reasonable, and thus her rejection of the proposed accommodations removed her from the category of "qualified individuals with a disability"). The undisputed evidence shows that Defendant twice offered Plaintiff the opportunity to use a motorized scooter so that he could continue to perform store visits—an essential, and perhaps the most important, function of the MD position. It is not disputed that Defendant signed and sent Interactive Process forms twice to Plaintiff that unequivocally informed Plaintiff that he could use a motorized scooter as an ADA accommodation. (Doc. Nos. 39-23 and 39-26). Nevertheless, Plaintiff refused to use a motorized scooter, stating that he did not need or want to use a mobility device. (Doc. No. 52 ¶¶ 102–07). Plaintiff faults Defendant for dropping the subject after the Interactive Process forms. But, Defendant was not required to repeatedly

offer the motorized scooter to Plaintiff.[5]  Plaintiff also claims that if Defendant had framed his options as either using a motorized scooter or losing his position, he would have opted to use a scooter.  Hindsight is twenty-twenty.  The law does not require Defendant to present options to Plaintiff in Plaintiff's preferred manner.

  5. <u>Summary of ADA Claim</u>

In sum, while Plaintiff is able to establish that he had a disability and that his employer had notice of it, he is not able to satisfy the third and fourth elements necessary to allege a prima facie failure-to-accommodate claim under the ADA. Plaintiff cannot prove that he was a qualified individual under the ADA, such that had he been given a reasonable accommodation, he could have "perform[ed] the essential functions of the job," <u>Wilson</u>, 717 F.3d at 345 (quoting 42 U.S.C. § 12111(8)), nor can he prove that his employer failed to make a reasonable accommodation for him.

**B. Plaintiff Cannot Allege a Prima Facie Case of Age Discrimination under the ADEA.**

Plaintiff claims that Defendant discriminated against him on the basis of his age in violation of the ADEA by (1) removing him from his MD position and (2) failing to hire or reassign him to any of the positions he sought before and after he took a

---

[5] <u>See</u> <u>Willett v. State</u>, No. 96-3374, 1997 WL 417367, at *1 (10th Cir. July 25, 1997) (stating "that it is immaterial whether Ms. Willett was initially offered a temporary or permanent lightweight cart" as long as plaintiff was offered the accommodation at one time); <u>Hankins v. The Gap, Inc.</u>, 84 F.3d 797, 801 (6th Cir. 1996) ("While it is true that an employer should normally advise an employee of available accommodations once the employee informs the employer that an accommodation is needed, it is equally true that an employer has no duty to reiterate self-evident options to an employee when she is clearly already aware of them.")

leave of absence from Lowe's. Proffering no direct evidence of age discrimination, Plaintiff must proceed under the McDonnel-Douglas burden-shifting framework. Under this framework,

> the plaintiff-employee must first prove a prima facie case of discrimination by a preponderance of the evidence. If [he] succeeds, the defendant-employer has an opportunity to present a legitimate, non-discriminatory reason for its employment action. If the employer does so, the presumption of unlawful discrimination created by the prima facie case "drops out of the picture" and the burden shifts back to the employee to show that the given reason was just a pretext for discrimination.

Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996). Regarding Plaintiff's claim that Defendant removed him from his MD position because of his age, Plaintiff must first establish a prima facie case by providing sufficient evidence that he is over 40, he was performing to Defendant's legitimate expectations, he was terminated, and he was replaced by a substantially younger individual. Arthur v. Pet Dairy, 593 Fed. App'x 211, 216–17 (4th Cir. 2015). And Plaintiff's claim that he was not hired because of his age requires him to demonstrate that (1) he was at least 40 years old; (2) he applied for an open position; (3) he was qualified for the position; and (4) the position remained open or was filled by a similarly qualified applicant who was substantially younger than the plaintiff. Laber v. Harvey, 438 F.3d 404, 430 (4th Cir. 2006).

At the time Plaintiff left his position as MD and applied for the vacant positions, Plaintiff was approximately 61 years old. Thus, he meets the requisite age to bring an ADEA claim. As evidence of age discrimination, Plaintiff points to

- the age of his replacement (40 years old)

- the average ages of the candidates applying for the Merchandising Director positions (approximately 40 years old)
- the average ages of those selected to interview for the Merchandising Director positions (between 36 to 38 years old); and
- the ages of those selected for the vacant Merchandising Director positions Plaintiff applied to (40 and 41 years old).

(Doc. No. 55 at 23). Contrary to what Plaintiff proposes, Plaintiff does not prove a prima facie case of age discrimination simply by showing that he was of the requisite age and the candidates selected as his replacement and for the Merchandising Director positions were significantly younger. Nor does Plaintiff establish his case by making conclusory allegations that he was more qualified than the other candidates without first offering evidence to support his supposed superior qualifications. Plaintiff does not show how he was meeting Defendant's legitimate expectations when he could not perform the essential job functions of the MD position. Nor does Plaintiff show why he was more well qualified than these younger individuals—all of whom had the desired experience and qualifications that the respective hiring managers were seeking. On the other hand, Defendant has proffered legitimate, nondiscriminatory reasons for asking Plaintiff to take a leave of absence and for choosing other candidates: Plaintiff could no longer perform the essential functions of the MD position, and Lowes adhered to its longstanding hiring policies and practices by hiring more well-qualified candidates for the Merchandise Director positions. Thus, the inference of age discrimination "disappears from the case." Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 513–14 (4th Cir. 2006).

Rather, under the McDonnel-Douglas burden-shifting framework, Plaintiff

must meet the high bar of showing that Defendant's proffered reasons were pretextual.  Id.  To survive summary judgment, Plaintiff must "prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of [Lowe's] decision." Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177-78 (2009); Cox v. Lowe's Home Centers, LLC, 2015 WL 7288689, at *6 (W.D.N.C. 2015) (granting summary judgment because the plaintiff "failed to show that age was the 'but-for' cause of Defendant's decision to terminate her employment").  Plaintiff is unable to prove that the "but-for" cause of why Defendant was replaced in his position as MD and why Defendant did not hire him to the Merchandising Director positions he applied for was because of his age. Plaintiff offers no evidence on this front besides reciting the age of his replacement and the ages of the applicant pool and selected candidates for the Merchandising Director positions.  This falls far below the "but-for" standard.  As the record reflects, Plaintiff could not perform the essential functions of the MD position, nor was he qualified for the director positions he applied for.  Thus, Defendant's reasons for replacing Plaintiff in his MD position and for choosing to hire other applicants instead of Plaintiff for the vacant positions were far from pretextual.  As the Fourth Circuit has stated, it is not the Court's "province to decide whether the reason was wise, fair, or even correct, ultimately, as long as it truly was the reason for the [adverse employment action]."  Hawkins v. PepsiCo, Inc., 203 F.3d 274, 279 (4th Cir. 2000).  Therefore, summary judgment is warranted on Plaintiff's age discrimination claim.

### C. Plaintiff's Retaliation Claim Fails as a Matter of Law

Plaintiff alleges that Defendant retaliated against him for filing his EEOC Charge by denying him the Merchandising Director of Outdoor Power Equipment position and by failing to place him in "other comparable positions which have become available since his filing of his charge." (Doc. No. 1 ¶ 69). To make a prima facie case for a retaliation claim, Plaintiff must show that "(1) he engaged in protected conduct; (2) an adverse action was taken against him by [Defendant]; and (3) there was a causal connection between the first two elements." Ulrich v. CEXEC, Inc., 709 F. App'x 750, 753 (4th Cir. 2017). But, if Defendant offers a legitimate, non-discriminatory reason for the action in question, Plaintiff must prove by a preponderance of the evidence that the proffered reason was pretextual. Id.

Here again, Plaintiff's claim fails because he cannot overcome the hurdle of demonstrating that Defendant's reasons for not hiring him to the vacant positions he was unqualified for were pretextual. Instead, as demonstrated above, the undisputed facts show that Defendant adhered to its standard hiring policy and hired candidates whom it deemed qualified for those vacant positions. Plaintiff grounds his retaliation claim in the timeline of events. Plaintiff points to the fact that he filed his initial Charge of Discrimination on November 30, 2015 while on leave and then applied for the Merchandising Director position in March 2016. (Doc. No. 55 at 24). Then Plaintiff asserts that his application "was given some unexplained scrutiny" and alleges that he was rejected for the position while others "less qualified" were interviewed and one was selected. Id. at 24–25. Plaintiff attributes this "unexplained

scrutiny" to the fact that he had already filed an EEOC claim against Defendant when he applied for the Merchandising Director position.

Plaintiff's timeline of events works against him and negates the causation element of Plaintiff's retaliation claim. "[C]omplaints of retaliation are considered stale after only a few months." <u>Jones v. Dole Food Co.</u>, 827 F. Supp. 2d 532, 554 (W.D.N.C. 2011), <u>aff'd</u>, 473 F. App'x 270 (4th Cir. 2012). A six-month lag has been found to "negate any inference of causation." <u>Hooven-Lewis v. Caldera</u>, 249 F.3d 259, 278 (4th Cir. 2001). Plaintiff's rejection for the Merchandising Director position in May 2016 was more than "a few months" after he filed his EEOC Charge in November 2015. Thus, now Plaintiff's retaliation claim is stale, and Defendant is entitled to summary judgment on this claim.

## IV. CONCLUSION

Plaintiff, Mr. Elledge, appears to have been a loyal, hard-working, productive employee whom, when healthy, rose in rank and made valuable contributions to his company. Conversely, Lowe's seems to have been diligent in providing extensions, accommodations, and opportunities to Mr. Elledge subsequent to his knee troubles. Unfortunately, there is no happy-ever-after ending to this employment tale. But that result does not give rise to actionable claims of discrimination.

**IT IS, THEREFORE, ORDERED** that:

1. Defendant's Motion for Summary Judgment is **GRANTED** on all claims.

2. Plaintiff's Motion to Strike Supplemental Disclosures and Related
   Motions is now **DISMISSED as moot**.

3. The Clerk of Court is directed to close this case.

Signed: December 20, 2018

Robert J. Conrad, Jr.
United States District Judge